FILED - EASTERN DIVISION
CLERK U.S. DISTRICT COURT

AUG 21 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

RORY C. FOLSOM,

Petitioner,

v.

JOHN C. MARSHALL, Warden,

Respondent.

CASE NUMBER

CV05-3681-R(OP)

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

NOTICE OF FILING
OF MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION AND THE
LODGING OF PROPOSED JUDGMENT
AND/OR ORDER

TO:    All Parties of Record

You are hereby notified that pursuant to the Local Rules Governing Duties of Magistrate Judges, the Magistrate Judge's report and recommendation has been filed and a proposed judgment and/or order has been lodged on **August 21, 2007**, copies of which are attached.

Any party having objections to the report and recommendation and the proposed judgment and/or order shall, not later than August 31, 2007, file and serve a written statement of objections with points and authorities in support thereof before the Honorable **OSWALD PARADA    **, U.S. Magistrate Judge.

Failure to so object within the time limit specified shall be deemed a consent to any proposed findings of fact. Upon receipt of objections, or upon lapse of the time for filing objections, the case will be submitted to the District Judge for disposition. Following entry of judgment and/or order, all motions or other matters in the case will be considered and determined by the District Judge.

The report and recommendation of a Magistrate Judge is not a final appealable order. A notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

CLERK, UNITED STATES DISTRICT COURT

Dated: 8/21/07

By  C. Sasse
Deputy Clerk

Attachments

M-51 NOTICE OF FILING OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
AND THE LODGING OF PROPOSED JUDGMENT AND/OR ORDER

DOCKETED ON CM

AUG 21 2007

FILED - EASTERN DIVISION
CLERK U.S. DISTRICT COURT

AUG 21 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RORY C. FOLSOM, | Case No. CV 05-3681-R (OP) |
| Petitioner, | |
| vs. | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| JOHN C. MARSHALL, Warden, | |
| Respondent. | |

This Report and Recommendation is submitted to the Honorable Manuel L. Real, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## I.

## PROCEEDINGS

On May 17, 2005, Petitioner Rory C. Folsom ("Petitioner"), filed the current Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition"). Petitioner challenges the California Board of Prison Term's ("Board") decision finding him unsuitable for parole after a hearing conducted on August 1, 2001. In accordance with this Court's Order Requiring Response to Petition, on November 1, 2006, Respondent filed an Answer, along

1

with supporting exhibits ("Answer"). On December 29, 2006, Petitioner filed a Traverse to the Answer, along with supporting exhibits ("Traverse"). Thus, this matter now is ready for decision.

## II.

## FACTUAL BACKGROUND

*Commitment Offense.*

On March 28, 1986, Petitioner plead guilty to second degree murder in violation of California Penal Code section 187. (See Lodgment No. A1.) On April 29, 1986, Petitioner was sentenced to a state prison term of fifteen years to life. (Id.) There are two versions of the facts of the commitment offense. The version below is taken from the Los Angeles County Probation Officer's Report:

Between October 17, 1983, and October 20, 1983, victim, Hugo Valencia . . . was murdered by multiple stab wounds. Codefendant [Juan Alvarez, Petitioner's brother-in-law and crime partner] contends [that Petitioner] murdered the victim out of Codefendant's presence. . . . [Valencia] was known as a drug dealer, primarily with cocaine. [Valencia] had been bound hand and foot with surgical tape and was also gagged. [Valencia]'s home was ransacked. There was no forced entry. Black spray paint was noted on some walls in the bedroom and den and also was noted on some windows. There were fifteen stab wounds to the neck, back, and chest, one of the wounds perforating the heart, and other wounds were to the diaphragm, lungs, and stomach. There was even a slash on [Valencia]'s neck. Codefendant Alvarez contended that [Petitioner] brought a lot of cocaine to Alvarez's brother in San Diego County. According to [investigating officer] Bill [Gayley], at least a pound of cocaine was removed from [Valencia]'s residence. Codefendant contended that [Petitioner] had stated, "that guy went for the piece (Codefendant

2

Juan [Alvarez]'s gun) and I had to knife him." The apparent motive was for cocaine and money. It appears that $800 to $1000 was taken. Codefendant contended that [Petitioner] had to get rid of bloody clothing while on the way to Ramona to visit Alvarez's brother.

(Answer Ex. No. 2 at 6, 7.)

Petitioner's version of the facts differs from the above. Petitioner denies that he murdered Valencia, rather, he claims that it was Alvarez who committed the offense outside of Petitioner's presence. (Id. Ex. No. 6 at 41-44.) The following set of facts are according to Petitioner's account, as reported in the transcripts of the parole board hearing on August 1, 2001:

[Alvarez] asked [Petitioner] if he could borrow [Petitioner's] car while [Petitioner] was at [work] to go pick up his property that he had left behind [at Valencia's home, where Alvarez previously lived]. When [Alvarez] came back down to the range at approximately four-thirty he asked if [Petitioner] could go back with him because he was having problems getting his property. . . . [When Petitioner and Alvarez] got to the house . . . [Alvarez] g[ot] out of the car . . . [w]ent up to the residence and knocked on the door. Mr. [Valencia] went to answer the door. [Petitioner] turned the car off, [and] entered the house. Juan [Alvarez] and Hugo [Valencia] were arguing in the hallway . . . speaking Spanish back and forth. [Petitioner] told Juan ["]get your stuff and let's go["] . . . . [Alvarez and Valencia] start[ed] . . . clobbering each other . . . [so Petitioner] separated them. [Petitioner told Alvarez to] just get [his] property. [Alvarez] said [the property] was in [a] room . . . [but] the door's locked . . . and Hugo's got to open the door. [Alvarez] turned around to open the door again and tried to force it open . . . [but Valencia] jumped on his back. [Petitioner] took [Valencia] off [Alvarez] and threw [Valencia] to the

3

ground and told [Alvarez] to get something to tie [Valencia] up [with] . . . . [Alvarez] went into the bathroom, and [came] out with some surgical tape. [Alvarez] tied [Valencia's] hands behind his back first and then pulled his legs up behind him and tied the legs. [Petitioner] cut [the tape] with his K-Bar that [Petitioner] had on [him]. [Petitioner] gave [the knife] to [Alvarez] and then when [Alvarez] flipped [Valencia] back over [Valencia] started yelling. [Petitioner and Alvarez] got up, [and Petitioner] kicked the door down . . . [and told Alvarez to] get [his] property and give it to [Petitioner]. [Alvarez] hand[ed] [Petitioner] a box . . . [Petitioner] . . . put the box in [the car]. [Petitioner] entered the house . . . one more time[, and Alvarez] handed [Petitioner] another box and a guitar. [Petitioner] put [them] in the car. [Petitioner] [] enter[ed] the house again . . . [Alvarez] said [he would] be out in a minute . . . so . . . [Petitioner] put the rest of the stuff in [the car]. A couple minutes later [Alvarez] exited the house and [they] left. On the way home [Alvarez] said he had ripped [Valencia] off and [had] stabbed him.

(Id.)

During the hearing, Petitioner stated that Alvarez showed him the cocaine stolen from Valencia while in the car, and again at the kitchen table in Petitioner's home. (Id. at 45.) Petitioner stated that, upon returning home with the stolen cocaine, he told his wife, Guillermina Alvarez, that "there's something we [(Petitioner and Juan Alvarez)] did. Now we can take care of the bill." (Id.) Also, Petitioner admitted to both consuming and selling some of the cocaine, but claimed he didn't personally receive any of the money from the cocaine sales, because he sent all proceeds to Alvarez. (Id. at 50.)

*Trial and Sentencing.*

Petitioner was charged with one count of second degree murder, one count

of robbery, and one count of burglary, in violation of California Penal Code sections 187, 211, and 459, respectively. (Answer at 3.) There was a special circumstance alleged, in that the murder occurred during the commission of a robbery and burglary, and that Petitioner used a knife during the commission of all counts, in violation of California Penal Code sections 190.2(a)(17) and 12022(b), respectively. (Id.) Pursuant to a plea bargain, Petitioner plead guilty to one count of second degree murder and received an indeterminate state prison term of fifteen years to life. (Id. Ex. No. 1.)

*Parole Denial by Board.*

Petitioner appeared before the Board on August 1, 2001, for his fifth parole consideration hearing and was found unsuitable for parole at that time.[1] (Traverse at 14.) At the hearing, Petitioner conceded that he was convicted and sentenced but maintained throughout the proceeding that he was innocent of the actual murder of Valencia. (Answer Ex. No. 6 at 40-44. ) The Board denied parole primarily based on the commitment offense. (Id. at 107.) The Board felt that the calculated execution and egregious nature of the offense warranted a longer period of rehabilitation and programming for Petitioner. (Id. at 111.)

The Board also considered other factors in reaching its decision regarding Petitioner's unsuitability for parole. First, the Board noted Petitioner's prior criminal conviction for possession of a deadly weapon, for which he was placed on probation for one year. (Id. at 108.) However, the Board also noted that Petitioner had no other criminal record as an adult or a juvenile. (Id. at 107.)

Second, the Board examined Petitioner's institutional record which contained five incidents of rules violations. (Id. at 108.) The Board

---

[1] California Code of Regulations, Title 15, section 2402, sets forth the parameters within which the Board must determine the parole suitability of a life prisoner. The entire text of that provision is set forth in endnote 1.

acknowledged that two violations were non-serious, but that the two most serious violations were also the most recent; one for trafficking narcotics and one for engaging in mutual combat, both of which occurred in 1996. (Id.) The Board cited the gravity and recency of these two violations as one of the main reasons for the parole denial. (Id. at 111.)

Third, the Board noted that Petitioner's psychological evaluations were supportive of release on parole. (Id. at 108.) However, the Board also noted that the psychological report failed to include specific findings in accordance with the proper guidelines, such as comparisons between Petitioner and the citizens of the community, leading the Board to request another psychological evaluation. (Id.)

Fourth, the Board considered the oppositions to parole by the Los Angeles County District Attorney. (Id.)

Fifth, the Board noted that Petitioner still alleged that he did not murder Valencia, rather the murder was committed by Alvarez, outside of Petitioner's presence, which is in direct conflict with Alvarez's claims. (Id. at 107.)

Finally, the Board commended Petitioner for his accomplishments in prison, such as positive work reports in maintenance plumbing and the print plant. (Id. at 109.) The Board also noted that Petitioner completed a silk-screen vocation, became certified in asbestos operation maintenance, as well as a lead awareness program, and acknowledged Petitioner's educational developments, in that he obtained a Bachelor of Arts degree, and was, at such time, working on paralegal and FEMA programs. (Id.) The Board further commended Petitioner for his recent involvement with several self-help programs, such as Conflict Resolution, Narcotics Anonymous, work as a Laubach tutor, and Life Skills, among others. (Id. at 110.) Notwithstanding these positive gains, the Board found Petitioner unsuitable for parole for a period of two additional years primarily due to the callous disregard for human suffering evidenced by the cruel manner in which the commission of the commitment offense was carried out, as well as the recency of

the two conduct violations. (Id.) Specifically, the Board stated that:

> The [Board] has reviewed all the information received from the public and relied on the following circumstances in unanimously concluding that [Petitioner] is not yet suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released from prison. The commitment offense was carried out in a cruel manner . . . [one] which demonstrates callous disregard for human suffering. . . . Both [Petitioner and Alvarez] have blamed each other [for the murder]. . . . Institutionally he has not fully participated in beneficial self-help and therapy programming. He had some misconduct issues . . . . He had a . . . trafficking of narcotics and a . . . mutual combat. We'll note that the District Attorney of Los Angeles County is opposed to a finding of suitability. We will also note that the correctional counselor writes this inmate would pose a low to moderate degree of threat. The [Board] makes the following findings: the prisoner does need . . . self-help and therapy programming in order to face, discuss, and understand the causative factors which led to the life crime. Until progress is made he continues to be unpredictable and a threat to others. His gains are recent and he must demonstrate an ability to maintain gains over an extended period of time and I'm referring to the last two [conduct violations of trafficking narcotics and mutual combat] which were only five years ago. Nevertheless . . . [Petitioner] is involved and should be commended for [his] activities. However these positive aspects of his behavior do not yet outweigh the factors of unsuitability.

(Answer Ex. No. 6 at 109, 110.)

///

*Habeas Corpus Denial at State Court Level.*

<u>Superior Court denial of habeas corpus relief</u>

On July 10, 2003, Petitioner filed a habeas corpus petition in the Los Angeles County Superior Court, which was denied on September 9, 2003. (Answer Ex. No. 7 at 112.) The court found that the Board's decision to deny parole was not devoid of factual basis, was supported by "some evidence," and denied the petition. (<u>Id.</u>) See <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 658 (2002).

<u>Court of Appeal and Supreme Court denials of habeas corpus relief</u>

On October 13, 2003, Petitioner filed a habeas corpus petition in the California Court of Appeal, which was summarily denied on October 21, 2003. (Answer Ex. No. 8 at 177.)

On November 28, 2003, Petitioner filed a habeas corpus petition in the California Supreme Court, which was summarily denied on December 1, 2004.[2] (<u>Id.</u> Ex. No. 9 at 186.)

## III.

## <u>PETITIONER'S CLAIMS</u>

1.  The Board's finding of unsuitability for parole based upon the commitment offense was discovered in violation of Petitioner's due process right to "due consideration" of his application for release on parole;

2.  The Board's hearing panel violated Petitioner's plea agreement by considering special allegation and/or charges which were specifically stricken by the court as part of the plea bargain;

---

[2] Where, as here, a higher state court has denied a claim without explanation, federal courts "look through" that denial to the last reasoned state decision; here, the opinion of the superior court. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-806, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, n.2 (9th Cir. 2000).

8

3. The Board has implemented a policy, practice, custom, or procedure whereby they are denying parole release dates in excess of 97% of all parole consideration hearings held which has denied the Petitioner of substantive and procedural due process rights to due consideration of his application for release on parole;

4. Petitioner has alleged the existence of an unlawful policy of the executive branch based on either a "no-parole" policy, a pattern of under inclusion, or simply the abject failure to comply with the mandate of penal code section 3041 that parole is to "normally" be granted;

5. The plea bargain negotiated with the Petitioner is invalid as it involved enticements and/or benefits which were not capable of being kept, as said enticements and/or benefits were contrary to the controlling legal statute(s) and/or administrative regulations in effect at the time of the commitment offense;

6. The paradigm shift of the Board away from granting of paroles to murder offenders has deprived the Petitioner of the only potential benefit for his acceptance of a plea bargain, and has resulted in both due process and ex post facto violations upon the Petitioner.

(Petition at 13, 24, 30, 36, 42, 48.)

For the purposes of organization and simplicity, this Court will consider Petitioner's claims as four encompassing claims: 1) the Board's denial of parole violated Petitioner's due process rights; 2) the Board's postponement of Petitioner's subsequent parole hearing by an additional two years abrogated Petitioner's right to due process; 3) the Board's refusal parole denial was the result of an unlawful underground executive agenda; and 4) that the terms of Petitioner's

plea agreement were breached by the Board's denial of parole.

## IV.

## STANDARD OF REVIEW

The standard of review applicable to Petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

Further, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) (as amended).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from

the result the Supreme Court reached on "materially indistinguishable" facts. See Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam); Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or are based on 'an unreasonable determination of the facts.'" Early, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360-61, 154 L. Ed. 2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Woodford, 537 U.S. at 27; Williams, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. See Williams, 529 U.S. at 409-10; see also Woodford, 537 U.S. at 25; Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

The Ninth Circuit has held that the same standard of objective unreasonableness applies where a petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2). See Bruce v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004); Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004). In Taylor, the Ninth Circuit observed that "[s]uch a challenge may be based on the claim that

the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all." Taylor, 366 F.3d at 999 (internal citations omitted). In order to conclude that a state court finding was unsupported by substantial evidence in the state court record, the reviewing federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Id. at 1000. In order to conclude that the state court fact-finding process was defective in some material way, the reviewing federal habeas court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Id. Examples in this latter category are where the state court "makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence," where the state courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim," and where the state court "has before it, yet apparently ignores, evidence that supports petitioner's claim." Id. at 1001. As the Ninth Circuit explained, "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness . . . ." Id. at 1000.

## V.

## DISCUSSION

**A.    Petitioner Enjoys a Federally Protected Liberty Interest in Parole.**

The Ninth Circuit has held that a habeas petitioner has a federally protected liberty interest in parole. Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) ("Because we hold that Sass has a constitutionally protected liberty interest in a parole date, we proceed to examine whether the deprivation of this interest, in this case, violated due process."); see also Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing cases).

12

Moreover, Supreme Court precedent clearly establishes that Petitioner enjoys a federally protected liberty interest in parole. Still, a prisoner has "no constitutional or inherent right . . . to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 2104, 60 L. Ed. 2d 668 (1979); Bergen v. Spaulding, 881 F.2d 719, 721 (9th Cir. 1989). However, a state's parole scheme that uses mandatory language to "create[ ] a presumption that parole release will be granted" when or unless certain designated findings are made, can give rise to a liberty interest protected by the due process clause. Greenholtz, 442 U.S. at 12; Board of Pardons v. Allen, 482 U.S. 369, 377-78, 107 S. Ct. 2415, 2420-21, 96 L. Ed. 2d 303 (1987); McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

At the time of Petitioner's parole hearing, California's parole scheme provided that the Board:

shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b) (2001).

Thus, "[u]nder the 'clearly established' framework of Greenholtz and Allen, California's parole scheme gives rise to a cognizable liberty interest in release on parole." McQuillion, 306 F.3d at 902; Biggs v. Terhune, 334 F.3d 910, 914-15 (9th Cir. 2003). "Because the California parole scheme vests in every inmate a constitutionally protected liberty interest, [the Court] look[s] to the second step in the procedural due process analysis to see if adequate procedural protections were afforded [petitioner]." Biggs, 334 F.3d at 915.

/ / /

13

**B.** **The Board's Finding of Petitioner's Unsuitability for Parole Did Not Violate Due Process Because It Was Supported by Some Evidence.**

Due process requires that "some evidence" support the parole board's determination, and that the evidence relied upon must possess "some indicia of reliability." Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904 ("in reviewing the parole rescission determination in this case, we ask only if the determination has been supported by 'some evidence' having 'some indicia of reliability.'"); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme Court in Superintendent v. Hill, 472 U.S. 445, 456, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)); Caswell v. Calderon, 363 F.3d 832, 839 (9th Cir. 2004). The "some evidence" standard is satisfied if there is any reliable evidence in the record that could support the conclusion reached. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987); Hill, 472 U.S. 445, 455-456 ).

At the outset, the Ninth Circuit articulated the quantum of evidence necessary to uphold a parole board's determination of unsuitability:

> To determine whether the some evidence standard is met "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."

Sass, 461 F.3d at 1128 (citations omitted).

With this standard of review in mind, this Court now turns to the evidence contained in the record of the August 1, 2001, Board hearing and finds that there is "some evidence" to support the Board's finding that, if paroled, Petitioner would pose an unreasonable risk of danger to society or threat to public safety if released from prison. (See Answer Ex. No. 6 at 107.) Contrary to Petitioner's claims, as the superior court found, the Board based its decision to deny parole on the callous

14

disregard for human suffering, characterized by the commission of the crime, among other factors, such as post-conviction behavior. (Id. Ex. No. 6 at 110.) See also Rosenkrantz, 29 Cal. 4th at 637-652, 683-686.[3]

Furthermore, the Board noted that the motive for this murder appeared to be to rob Valencia of cocaine so Petitioner and Alvarez could sell it, as a large portion of it was sold and consumed after the offense by Petitioner and remained in his possession for a period of several months.[4] (See Answer Ex. No. 6 at 49, 50, 111.) Accordingly, in examining the commission of the crime as well as the apparent motive behind it, it is not unreasonable to believe that this crime was premeditated and calculated. The Board's decision, while largely based on the nature of the offense, also involved the consideration of other factors such as Petitioner's record while incarcerated (which included two serious rules violations for trafficking narcotics and engaging in mutual combat), as well as his recent involvement in self-help programs, psychologist reports, and continued assertions of innocence, which were contradicted by the testimony given by both codefendant Juan Alvarez. (Id. at 107-111.)

In Biggs, the Ninth Circuit upheld the denial of parole to a prisoner, Biggs, who was convicted of felony murder. The parole denial was based upon a finding that the gravity of the commitment offense and Biggs' conduct prior to imprisonment precluded his release. Biggs, 334 F.3d at 910. Although Biggs'

---

[3] Petitioner's claims of a "no parole" policy by the governor, as well as due process and ex post facto violations were similarly rejected by the court due to Petitioner's failure to prove such allegations. (Answer Ex. No. 7 at 112.)

[4] Petitioner was not arrested until nine months after the commitment offense. (Answer Ex. No. 6 at 111.) Moreover, during Petitioner's trial, Corporal Hergenburg, a corporal with whom Petitioner worked while in the military, testified that Petitioner stated he had purchased a pound of cocaine, which Petitioner and Corporal Hergenberg used together. (Id. at 93.) Petitioner further admits that he offered to sell the cocaine to Corporal Hergenberg. (Id. at 94.)

15

conduct while incarcerated was exemplary, the victim of the murder was a potential witness in another case. Id. at 912, 916. Furthermore, the victim was bludgeoned to death, thus exhibiting a callous disregard for life. Id. Even though Biggs himself did not bludgeon the victim, Biggs was involved in the murder conspiracy from its inception. Id. On these facts, the Ninth Circuit did not find a due process violation based on the immutable factors of Biggs' prior criminality and the commitment offense. Id. ("[a]s in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.")

In Jancsek, the Ninth Circuit also upheld the denial of parole based on the gravity of the commitment offense and conduct prior to imprisonment. Jancsek, 833 F.2d at 1390-91. Specifically, the Ninth Circuit stated:

> The board rested its decision [to deny parole], in part, on the fact that a child was present during the murder. Though Jancsek disputes this fact, it is supported by both the trial judge's After Sentence Report and the prosecutor's Fact Summary; we cannot say that these reports lack sufficient indicia of reliability. Together they outweigh the statement by Jancsek's attorney that to his "recollection . . . it was not determined" at trial whether the child was present. But even if we disregard this disputed fact, the board had more than "some" evidence supporting aggravation. They based their decision not only upon the child's presence at the homicide but also upon the gruesome and exceedingly violent details of the crime. Jancsek does not dispute the fact that he hogtied the victim, stabbed her 32 times, and slit her throat. Moreover, though it is not clear the board considered additional aggravating circumstances, there was evidence of other assaultive conduct unrelated to the murder; this included a previous kidnapping

and an uncharged attempt to strangle the victim weeks before the homicide.

Jancsek., 833 F.2d at 1390.

Finally, in Irons, the Ninth Circuit upheld the denial of parole based on the gravity of the commitment offense.[5] See Irons, 479 F.3d at 663-64. Specifically, the Ninth Circuit opined that:

> Because we find that Irons' crime was similarly cruel or vicious, we cannot say that there was not "some evidence" to support the Board's determination that Irons was unsuitable for parole under California law. Specifically, given that his commitment offense, standing alone, is a sufficient basis for deeming a petitioner unsuitable where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied Hill's "some evidence" principle.

Irons, 479 F.3d at 664.

---

[5] In 1985, Irons was convicted of second degree murder in the death of his former housemate and sentenced to seventeen years to life in prison. At the time of the offense, Irons was living in the home of a couple, with another tenant, John Nicholson. The couple suspected that Nicholson was dealing drugs and was stealing from them. Irons shared their suspicions. He confronted Nicholson and an angry argument ensued in which Nicholson denied responsibility for the thefts. Irons went to his room, retrieved his gun, and then went to Nicholson's room where he fired 12 rounds into Nicholson and, after Nicholson complained that he was in pain, stabbed him twice in the back. He then wrapped Nicholson's body in a sleeping bag and left it in the room for the ten days it took him to procure a car. Irons then took the body to the coast, weighed it down, and disposed of it in the ocean. Irons, 479 F.3d at 660.

17

Here, Petitioner's conduct both before and after incarceration was evaluated by the Board in denying his release on parole. Petitioner engaged in the selling of the stolen cocaine during the nine month period between the commitment offense and his arrest, and continued to sell narcotics as recently as 1996, while he was incarcerated.[6] (Answer Ex. No. 6 at 77, 83.) By Petitioner's own admissions to trafficking narcotics in prison, there was more than "some" evidence that Petitioner had not reformed himself of the same sort of conduct which motivated the commitment offense, thereby making him an unreasonable risk of danger to society or threat to public safety if released. (Id.)

Where, as here, the Board has considered the commitment offense, together with other factors relevant to Petitioner's parole suitability, this Court finds that the California courts' affirmance of the Board's finding of parole unsuitability was neither contrary to, nor involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.[7]

---

[6] Petitioner admitted to carrying methamphetamine from one prison building to another, but denied any involvement by his current wife, despite there being some speculation that it was his wife who had supplied him with the methamphetamine. (Answer Ex. No. 6 at 77, 82.)

[7] This Court is aware of Irons' limited holding that "given the particular circumstances of the offenses in [Biggs and Sass], due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons, 479 F.3d at 665 (emphasis added). Although Petitioner's minimum eligible parole date lapsed on July 9, 1994, this Court still does not find that Petitioner is entitled to habeas relief. (See Answer Ex. No. 6 at 34.)

Irons does not stand for the proposition that due process is automatically violated if the Board relies solely upon the commitment offense to find an inmate unsuitable for parole after the inmate's minimum eligible parole date has passed. In fact, the Biggs court opined that:

"[d]ue [p]rocess is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving

(continued...)

18

**C.     The Board's Postponement of Petitioner's Subsequent Parole Hearing by an Extra Two Years Did Not Abrogate Due Process**

California law allows the Board to defer a parole hearing for as many as five years "if the prisoner has been convicted of murder, and if the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing." Cal. Pen. Code § 3041.5(b)(2)(B). This amendment allows the Board to avoid the futility of having to conduct the token annual hearing simply to reannounce its denial of parole suitability. California Department of Corrections v. Morales, 514 U.S. 499, 512 (1995).[8] Accordingly, section 3041.5 serves "as a means to 'relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released.'" In re Jackson, 39 Cal. 3d 464, 473 (1985) (quoting legislative history). Also, the California Code of Regulations sets forth the requisite procedure for postponing subsequent parole hearings as

---

[7](...continued)
the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process." Lankford v. Idaho, 500 U.S. 110, 121, 111 S. Ct. 1723, 114 L. Ed. 2d 173 (1991) (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 163, 71 S. Ct. 624, 95 L. Ed. 817 (1951) (Frankfurter, J., concurring)). A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

Biggs, 334 F.3d at 916-17 (emphasis added).

[8] When the court decided Morales, California Penal Code section 3041.5(b)(2) applied only to prisoners who had been convicted of "more than one offense which involves the taking of a life." 514 U.S. at 510. The amendment has since been revised as of July 1, 2005, to include only "prisoner[s] . . . convicted of murder." Cal. Pen. Code § 3041.5(b)(2)(B).

19

follows:

> In cases in which the panel may deny a subsequent parole hearing for more than one year, it shall utilize the criteria specified in sections 2281 or 2402 as applicable. It shall make specific written findings stating the bases for the decision to defer the subsequent suitability hearing for two, three, four, or five years.

Cal. Code of Regs. title 15, § 2270 (2007).

Furthermore, in deferring a subsequent parole hearing for more than one year, the Board must address its reasons for doing so separately from the denial of parole. In re Jackson, 39 Cal. 3d at 477. Petitioner construes this language to mean the Board must provide reasons to postpone parole separate from those used in the decision to deny parole. This Court disagrees with this interpretation. The court in Jackson specifically stated:

> This holding does not mean that the reasons for refusing to set a parole date must necessarily be completely different from the reasons for excepting an inmate's case from annual review. The latter decision involves a prediction that at least during the period of the postponement, an inmate will not likely become suitable for parole. That prediction may involve some of the same facts on which the unsuitability determination is based. What is required, however, is an identification of reasons which justify the postponement.

Id. at 479.

In Jackson, the Board's decision contained only one statement providing reasoning for both the denial of parole and the postponement of the subsequent hearing, which the court found to be insufficient. Id. In its holding, the court concluded that in deciding to defer a subsequent hearing, "the crucial factor is that the record reflect recognition . . . that [the Board] is making a separate and additional choice." Id. (quoting People v. Belmontes, 34 Cal. 3d 335, 348 (1983)).

20

Here, the Board specifically stated: "[i]n a separate decision, the [Board] finds that . . . it's not reasonable to expect that parole would be granted at a hearing during the next three years." (Answer Ex. No. 6 at 110.) The Board then listed several reasons for so concluding; that it used largely the same reasons in its decision to deny parole is of no consequence. See Jackson, 39 Cal. 3d at 479. Therefore, the Board's separate finding and recitation of reasons for postponing Petitioner's subsequent parole hearing did not violate his right to due process nor did it involve a decision contrary to, or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.[9]

**D.    The Board's Refusal to Grant Petitioner Parole Was Not the Result of an Unlawful Underground Executive Agenda.**

This Court rejects Petitioner's claim that the Board's finding of Petitioner's parole unsuitability is the result of a "no parole" policy. (Petition, Attachment p. 30.) California's highest Court has rejected this very argument, as have federal district courts. See In re Rosenkrantz, 29 Cal. 4th 616, 685-86 (2002) ("We conclude that the evidence relied upon by the trial court does not support its

---

[9] Respondent contends that the current Petition should be dismissed as untimely. (Answer at 2.) This Court finds, however, that Respondent's argument lacks merit, as Petitioner correctly followed the appeal process, filing each appeal at the next level of court system. See Nino v. Galaza, 183 F.3d 1003, 1009 (9th Cir. 1999) (holding that "the statute of limitations is tolled from the time the first state habeas petition is filed until the California Supreme Court rejects the petitioner's final collateral challenge"). Although Petitioner's parole suitability hearing took place on August 1, 2001, the Board's decision did not become final until August 23, 2001. (Traverse at 6.) On November 27, 2001, Petitioner filed an administrative appeal of the Board's decision, which was denied on January 14, 2003. (Id.) Thereafter, on July 10, 2003, Petitioner filed his first habeas petition in the superior court. (Id.) This Court does not consider this delay to be unreasonable, and rejects Respondent's argument of untimeliness. See Evans v. Chavis, 546 U.S. 189, 126 S. Ct. 846, 854, 163 L. Ed. 2d 684 (2006).

21

finding that the denial of petitioner's parole was based upon a policy of automatically denying parole to all murderers."); see also Johnson v. Finn, 2006 WL 195159, *1 (E.D. Cal. 2006) (citing Rosenkrantz, 29 Cal. 4th at 685-86, and declining to address petitioner's "no parole policy" claim for habeas relief because such claim is likely unmeritorious.). Based on the foregoing, this Court finds that the Board's refusal to grant Petitioner parole was not the result of an unlawful underground executive agenda.

**E. The Board Did Not Breach the Plea Agreement by Denying Petitioner Parole.**

Petitioner contends that the Board's finding of parole unsuitability violated the terms of his plea agreement. (Petition at 24, 42.) The record before this Court does not reveal any factual support for this claim. To the contrary, the transcript of the plea proceeding reflects that Petitioner, at the time of his plea, was aware that his sentence could be as long as a life term. (Answer Ex. No. 10 at 197.) Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief. James v. Borg, 24 F. 3d 20, 26 (9th Cir. 1994).

1. The Consideration of Special Allegations.

Petitioner first complains that the Board considered the special allegation of use of a weapon during the offense in denying parole, despite the terms of the plea agreement stipulating that the enhancement be stricken. (Petition at 24.) In making the plea agreement, the Deputy District Attorney told Petitioner that should he accept the agreement and plead guilty to second-degree murder, the special circumstance that Petitioner *personally* used a knife would be stricken. (Answer Ex. No. 10 at 202.)

This Court does not construe this agreement to mean that the Board could not consider the use of the knife in the offense at all, but rather that the Board could not consider the fact that Petitioner used the knife himself. While Petitioner is correct that the Board did consider the fact that a knife was used in the offense, the

22

Board stopped short of attributing its use to Petitioner. (Answer Ex. No. 6 at 107 ("I'm not sure . . . which of the two . . . did the actual attack . . . ."), 110 ("[the victim] was stabbed fifteen times with a knife . . . [b]oth the inmate and the crime partner point the finger at each other as to who actually did the stabbing.").) Moreover, excluding the fact that a knife was involved, the Board has provided enough reasons amounting to more than "some evidence" to find Petitioner unsuitable for parole.

> 2.    Parole Denial After Seven and a Half Years.

Petitioner further claims that the Board breached the plea agreement in that he was promised he would be paroled after serving half of his minimum sentence of fifteen years to life. (Petition at 42.) Examination of the record, however, reveals no such agreement. During the colloquy, the court specifically told Petitioner and counsel that Petitioner "would be eligible for parole within seven and a half years," but that "[t]here is no guarantee that [Petitioner] would be paroled immediately upon completion of that seven and a half years." (Answer Ex. No. 10 at 197.)

Petitioner's citation to Brown v. Poole, 337 F. 3d 1155 (9th Cir. 2003), in support of this claim is unavailing. (Petition at 45-46.) The petitioner in Brown challenged the Board's parole denial because the petitioner had entered into a plea agreement in which the petitioner was promised parole after serving half her time if she had a clean disciplinary record while incarcerated. Brown, 337 F. 3d at 1159. The court held that the terms of the plea agreement warranting her release were conditional on her exhibiting good behavior while incarcerated, but was in no way an actual guarantee of parole. Id. at 1160. The court in Brown found that the petitioner had upheld her end of the agreement by being a "model prisoner," who remained disciplinary free while incarcerated, thus compelling specific performance of the agreement, and causing the court to grant habeas relief. Id. at 1161.

The current case is unlike Brown, however, in two respects. First, the Deputy District Attorney in Brown had literally promised petitioner that if she remained disciplinary free, after serving half the minimum sentence, she would be paroled, 337 F. 3d at 1159, rather than promising parole *eligibility*, as Petitioner was promised here. (Answer Ex. No. 10 at 197.) Second, Petitioner, although eligible for parole at seven and a half years, failed to remain disciplinary free while incarcerated, committing two serious offenses in the five years prior to his 2001 parole hearing. See Izsak v. Sigler, 604 F. 2d 1205, 1207 (9th Cir. 1979) (holding that the Board acted correctly in considering the petitioner's institutional record as well as the severity of the crime in denying parole); Biggs, 334 F. 3d at 915 (holding that in deciding whether or not to grant parole, the Board may consider "all relevant information, including . . . whether the prisoner engaged in misconduct while [incarcerated]"). (Answer Ex. No. 6 at 77, 83.)

Nevertheless, Petitioner claims that he was convinced to enter into his plea agreement by the likelihood of being paroled after seven and a half years, when in actuality there was no way he would be paroled after such time. (Petition at 43.) The plea colloquy in Petitioner's case is unambiguous as to the maximum term Petitioner would serve. (Answer Ex. No. 10 at 197 ("the offer that was made to you is for a plea to second-degree murder, which has a sentence of fifteen years to life"), 202 ("Pursuant to our plea bargain that we have negotiated you will plead guilty to one count of murder . . . [y]ou will be sentenced to . . . fifteen years to life").) This Court does not agree that there was never a likelihood that Petitioner would be paroled after seven and a half years. The court specifically stated that "the odds of [Petitioner] not being paroled in seven and a half years maximum, depending on his conduct, is [sic] almost nil." (Answer Ex. No. 10 at 199.) Thus, Petitioner's own behavior during that seven and a half years was a legitimate factor the Board could consider in its determination of Petitioner's parole eligibility. Accordingly, this claim is without merit.

24

# VI.

# **RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition, and dismissing this action with prejudice.

DATED: August 20, 2007

HONORABLE OSWALD PARADA
United States Magistrate Judge

1. California Code of Regulations, Title 15, section 2402, provides as follows:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

25

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

    (C) The victim was abused, defiled or mutilated during or after the offense.

    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

    (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

26

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402 (2007).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RORY C. FOLSOM,                          )   Case No. CV 05-3681-R (OP)
                                         )
            Petitioner,                  )   J U D G M E N T
                                         )
      vs.                                )
                                         )
JOHN C. MARSHALL, Warden,                )
                                         )
            Respondent.                  )
_____)

      Pursuant to the Order Adopting Findings, Conclusions, and Recommendations of the United States Magistrate Judge,

      IT IS ADJUDGED that the Petition is denied and this action is dismissed with prejudice.

DATED: _____

                                      HONORABLE MANUEL L. REAL
                                      United States District Judge

Prepared by:

HONORABLE OSWALD PARADA
United States Magistrate Judge

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RORY C. FOLSOM,

             Petitioner,

       vs.

JOHN C. MARSHALL, Warden,

           Respondent.

Case No. CV 05-3681-R (OP)

ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 2254, the Court has reviewed the Petition, all the records and files herein, and the Report and Recommendation of the United States Magistrate Judge. The Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: _____

                         HONORABLE MANUEL L. REAL
                         United States District Judge

Prepared by:

HONORABLE OSWALD PARADA
United States Magistrate Judge